v.

**Thomas MILLER, Appellant.**

**No. WD 67760.**

Missouri Court of Appeals,
Western District.

Feb. 13, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 25, 2008.

Geoffrey W. Preckshot, Columbia, MO, for appellant.

S.A., Fulton, MO, pro se.

Before HAROLD L. LOWENSTEIN, Presiding Judge, JOSEPH M. ELLIS, Judge and THOMAS H. NEWTON, Judge.

JOSEPH M. ELLIS, Judge.

Thomas Miller appeals from a judgment entered in the Circuit Court of Callaway County granting a full order of protection against him to S.A. For the following reasons, the judgment is affirmed.

On August 1, 2006, S.A. filed a petition for a full order of protection under the Adult Abuse Act, §§ 455.005 through 455.090, against Miller, whom she did not know, alleging that Miller had been stalking her. S.A. cited numerous instances over the preceding three months where Miller had appeared at various parks, a restaurant, Wal–Mart, and the parking lot of her workplace and persistently stared at her. S.A. claimed that she was afraid of Miller and felt that she was in danger.

The case was tried in the Circuit Court of Callaway County on October 23 and 27, 2006. The trial court subsequently entered its judgment granting S.A. a full order of protection against Miller. Miller brings two points on appeal from that judgment.

"In a court-tried case, we will affirm the judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *McGrath v. Bowen,* 192 S.W.3d 515, 517 (Mo.App. E.D. 2006). In reviewing the judgment under this standard, "[w]e defer to the trial court's determinations of credibility and consider only the facts and inferences which support the judgment." *Leaverton v. Lasica,* 101 S.W.3d 908, 911 (Mo.App. S.D.2003). "Because the trial judge is in the best position to gauge the credibility of the witnesses, in cases under the Adult Abuse Act, the discretion of the trial court should not often be superceded." *Wallace v. Van Pelt,* 969 S.W.2d 380, 383 (Mo.App. W.D.1998). Viewed in light of this standard of review, the evidence reflected the following.

In March 2006, S.A. started noticing Miller, whom she did not know, repeatedly riding his bike or jogging past her while she was using the walking trail by Stinson Creek in Fulton, Missouri. S.A. regularly walked on that trail with her sister-in-law. Each time Miller passed by them, S.A. noticed that Miller was staring intently at her in a way that made her feel uncomfortable. Miller would ride past and disap-

pear for a short while and then reappear to ride past them again.

After having several such encounters with Miller on the walking trail, S.A. noticed Miller following her through Wal-Mart one day. Miller followed her down every aisle she went down and stared at her as he did so. When S.A. stopped to talk with friends for about five minutes, Miller stopped about ten feet away and continued to stare at her. After S.A. hurried off to find her son, who worked in the sporting goods department, Miller apparently stopped following her through the store. Once S.A. checked out and her son was walking her out to her car, however, S.A. noticed Miller waiting outside by the front door of the store watching the exit. S.A. hurried to her car and left.

After the incident at Wal-Mart, S.A. noticed Miller repeatedly riding or jogging past her on the walking trail on a couple of other occasions. On one occasion, Miller appeared about to speak to her when her phone rang. Miller then briefly asked S.A.'s sister-in-law, who was walking with her, some questions about the weights she was carrying and continued on. Following this incident, S.A. stopped going to the walking trail because Miller made her too nervous.

On another occasion, S.A. was helping a friend stock a concession stand near the baseball fields at Memorial Park. As she unloaded supplies from her friend's trunk, S.A. noticed Miller circling the car on his bicycle and staring at her from a distance of twenty to thirty yards. When Miller started coming closer to her, S.A. walked into the concession stand and hid there until Miller finally left.

On May 28, 2006, S.A. was attending a graduation party for her nephew at a park pavilion. Shortly after she arrived, S.A. noticed that Miller pulled into the parking lot, parked, and began staring at her.

When Miller got out of the car and started walking toward the pavilion, S.A.'s husband and brother-in-law approached him and asked if he had a problem. Without responding, Miller turned around, got into his car, and drove off. Miller continued, however, to circle around the park and to stare at the pavilion as he would drive slowly past it. After circling several times in the car, Miller again parked his vehicle, got out, and began jogging in the same pattern he had been driving around the park, while watching the pavilion.

Subsequently, on three or four different occasions, S.A. noticed Miller come into Jalisco's restaurant, where she was dining. Miller would take a seat facing her, sitting alone, and stare at her for at least twenty minutes while she ate. The final time Miller came into the restaurant, on July 28, 2006, he sat down in a booth staring at S.A., but got up and left after her husband and brother-in-law looked at him. Miller left the restaurant, but continued to stare at S.A. for a few more minutes from outside the restaurant before leaving.

On August 1, 2006, S.A. was returning to her office from picking up some lunch, when Miller pulled into the office parking lot, leaving their two cars facing each other at a short distance. S.A. parked her car and hurried inside. After watching S.A. go into the office, Miller pulled out of the parking lot and went across the street to a car wash parking lot, where he pulled into a spot facing S.A.'s office. Miller stared at S.A.'s building for several minutes before leaving. Later that day, S.A. filed her petition requesting a full order of protection against Miller, which was subsequently granted by the circuit court.

In his first point challenging the court's grant of a protective order, Miller claims that the judgment was not supported by substantial evidence in three different re-

spects. He first argues that no evidence was presented establishing that he knew that his actions were unwanted by S.A. He next claims that the encounters between himself and S.A. were not such that a reasonable person would fear physical harm from him. Finally, Miller contends that staring at S.A. in a public place was a legitimate and lawful activity and cannot support the granting of a protective order.

A trial court's grant of a full order of protection must be supported by substantial evidence. *McGrath*, 192 S.W.3d at 517. "Substantial evidence is competent evidence from which the trier of fact could reasonably decide the case." *Leaverton*, 101 S.W.3d at 911. "Because there is real harm that can result in abusing the Adult Abuse Act and its provisions, including the stigma that may attach to a respondent who is ultimately labeled a 'stalker,' trial courts must exercise great care to ensure that sufficient evidence exists to support all elements of the statute before entering a full order of protection." [1] *McGrath*, 192 S.W.3d at 517.

Section 455.020 "provides that any adult who has been the victim of stalking may file a petition for protection alleging such stalking." *Id.* (emphasis omitted). " 'Stalking' is when an adult purposely and repeatedly engages in an unwanted course of conduct that causes alarm to another person when it is reasonable in that person's situation to have been alarmed by the conduct." [2] § 455.010(10). Thus, in order to be entitled to a full order of protection, S.A. was required to present substantial evidence that Miller: "(1) purposely and repeatedly; (2) engaged in an unwanted course of conduct; (3) that caused alarm to [Respondent]; (4) when it was reasonable in [her] situation to have been alarmed by the conduct." *Glover v. Michaud*, 222 S.W.3d 347, 352 (Mo.App. S.D. 2007). She was required to prove her allegations of stalking by a preponderance of the evidence. *George v. McLuckie*, 227 S.W.3d 503, 507 (Mo.App. W.D.2007). " 'Preponderance of the evidence is defined as that degree of evidence that is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the facts to be proved to be more probable than not.' " *Id.* (quoting *State Bd. of Nursing v. Berry*, 32 S.W.3d 638, 642 (Mo.App. W.D.2000)).

Miller first argues that insufficient evidence was presented to establish that he knew his actions were unwanted by S.A. in order to establish that he purposely engaged in an unwanted course of conduct. He notes that no evidence was presented indicating that S.A. or anyone else ever told him that he was bothering S.A. and points to his own testimony that he had no idea that he was staring at her or that this behavior was disconcerting to her.

The initial problem with Miller's argument is that the trial court was free to

---

1. As this Court noted in *Wallace v. Van Pelt*, 969 S.W.2d 380, 387 (Mo.App. W.D.1998):

 The potential for abuse of the stalking provisions of the Adult Abuse Act is great. And, the harm that can result is both real and significant, not the least of which will be the stigma that attaches by virtue of a person having been found to be a stalker. Moreover, such a finding could lead to criminal prosecution for violation of the criminal stalking statute, § 565.225. Thus, it is incumbent that the trial courts exercise

 great vigilance to prevent abuse of the stalking provisions in the Adult Abuse Act and in making sure that sufficient credible evidence exists to support all elements of the statute before entering a protective order.

2. The intent of the legislature in addressing stalking in the Adult Abuse Act was "to prevent potential violence, and the unnecessary and unjustified infliction of emotional distress." *George v. McLuckie*, 227 S.W.3d 503, 505 (Mo.App. W.D.2007).

reject his testimony as uncredible, and we must defer to the trial court's credibility determinations. *Wallace,* 969 S.W.2d at 383. After hearing Miller's testimony, the trial court may well have concluded that he was fully aware that S.A. did not want him following or staring at her.

Furthermore, the evidence reflected that, on one occasion, when she noticed him staring at her outside a concession stand, S.A. quickly went inside the concession stand and remained there. On another occasion, while she was attending a party in a park, as Miller walked toward the pavilion where S.A. was, S.A.'s husband and brother-in-law confronted Miller and asked if he had a problem. Miller did not respond, went back to his car, and drove off, but he continued to circle back to the park and drive slowly by the pavilion in his car. Also, after Miller followed S.A. around Wal–Mart for several aisles, Miller stopped following her after she hurried off to find her son, who worked in the store. The trial court was free to infer from the foregoing evidence that Miller was aware that S.A. did not want him following and/or staring at her.

■ Miller next argues that the evidence was insufficient to support a finding that his actions caused S.A. to have a reasonable fear of physical harm. Miller claims S.A. had no rational reason to believe that he was going to do anything to harm her merely from him staring at her.

"Section 455.010(10) requires that conduct cause 'alarm' to another person in order for the conduct to constitute stalking." *McLuckie,* 227 S.W.3d at 507. Furthermore, it must be reasonable under the circumstances to have been alarmed by the conduct. *Id.* " 'Alarm' means to cause fear of danger of physical harm." § 455.010(10)(c).

S.A. specifically testified at trial that Miller's actions had frightened and alarmed her and that she felt threatened, scared, and feared physical harm from Miller. She stated that he seemed to be getting bolder in his behavior toward her and indicated her fear that it might escalate to physical harm. This evidence clearly supported a finding that S.A. was subjectively fearful that Miller might cause her physical harm.

The record also supported a finding that S.A.'s fear was reasonable. A strange man, of whom she had no idea of his identity or intent, regularly and inexplicably appeared in places that she was and persistently stared at her. He had appeared in parks, at a restaurant, at Wal–Mart, and even in the parking lot of her place of business. On all of those occasions, he stared intently at her and generally behaved suspiciously. It is objectively reasonable for a woman to be alarmed under those circumstances and to believe that she might be in danger of physical harm from the individual.

Miller also contends that all of his actions were for a legitimate purpose. He claims that he had a right to be all of the places where he encountered S.A. and, further, that he has a right to look or stare at anything he chooses.

Section 455.010(10)(a) defines a "course of conduct" as "a pattern of conduct composed of repeated acts over a period of time, however short, that serves no legitimate purpose." Miller claims his actions all had a legitimate purpose.

The definition in § 455.010(10)(a) goes on to provide, however, that "[s]uch conduct may include, but is not limited to, following the other person or unwanted communication or unwanted contact." Under the evidence presented in this case, the trial court could certainly conclude that Miller had engaged in a pattern of following S.A. and/or exposing her to unwanted contact with him. Furthermore, the Court

was not required to accept any of his testimony regarding his purpose or motives as credible. Point denied.

In his remaining point, Miller contends that the definition of stalking in § 455.010(10) unconstitutionally infringes upon his fundamental right to be present in a public space and to observe whatever he wishes. He argues that he "had a [constitutional] right to look upon S.A. in public to whatever intensity and duration he elected."

 "To properly raise a constitutional issue, a party must: (1) raise the question at the first available opportunity; (2) specifically designate the constitutional provision alleged to have been violated, such as by explicit reference to the article and section, or by quotation from the particular provision; (3) state the facts showing the violation; and (4) preserve the constitutional question throughout for appellate review." *Firemen's Ret. Sys. v. City of St. Louis,* 2006 WL 2403955 *5 (Mo.App. E.D.2006). "Additionally, a constitutional challenge to a statute must not only have been presented to the trial court, but the trial court must have ruled thereon." *Mo. Prosecuting Attorneys & Circuit Attorneys Ret. Sys. v. Pemiscot County,* 217 S.W.3d 393, 400 (Mo.App. S.D. 2007). "The purpose for this requirement is to give the trial court an opportunity to fairly identify and rule on the issues and to prevent surprise to the opposing party." *Id.*

Miller failed to properly raise his constitutional claim before the trial court. Accordingly, that claim is not preserved for appellate review. Point denied.

The judgment is affirmed.

All concur.