

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| **CITY OF HARRISONVILLE,** | ) | |
| **Appellant-Respondent,** | ) | |
| | ) | |
| **v.** | ) | **WD74429 (consolidated with WD74436** |
| | ) | **and WD74950)** |
| **McCALL SERVICE STATIONS d/b/a** | ) | |
| **BIG TANK OIL, et al;** | ) | **FILED: February 25, 2014** |
| **THE MISSOURI PETROLEUM** | ) | |
| **STORAGE TANK INSURANCE FUND,** | ) | |
| **Respondent-Appellant.** | ) | |

**Appeal from the Circuit Court of Cass County**
**The Honorable Jacqueline A. Cook, Judge**

**Before Division Two: Alok Ahuja, P.J., Mark D. Pfeiffer and Anthony Rex Gabbert, JJ.**

During construction of a sewer upgrade project, a contractor for the City of Harrisonville discovered soil contaminated by petroleum products which had migrated from a nearby service station's underground storage tank system. The City contends that the Missouri Petroleum Storage Tank Insurance Fund promised the City that the Fund would pay the increased construction costs associated with the contamination, but that the Fund later reneged. The City sued the Fund and the service station's present and former owners, alleging claims of nuisance and trespass against the station owners, and fraudulent and negligent misrepresentation against the Fund. Following a jury trial, the City was awarded compensatory and punitive damages against the past and present station owners, and against the Fund. The trial court remitted the

punitive damages awarded against the Fund in part, finding that the award violated due process principles.

The Fund and the station owners appeal; the City cross-appeals from the trial court's remittitur of the jury's punitive damages award. We affirm the bulk of the trial court's rulings, but reverse the trial court's refusal to apply § 510.265.1(2),[1] which limits the punitive damages awarded against the Fund to five times the net amount of the judgment. Employing our authority under Supreme Court Rule 84.14, we modify the trial court's judgment to reduce the punitive damages awarded against the Fund to the amount authorized by § 510.265.1(2).

## Factual Background

McCall Service Stations, doing business as Big Tank Oil, owned a gas station in Harrisonville. In September 1997 McCall discovered that its underground gasoline storage tank system was leaking. McCall notified the Missouri Petroleum Storage Tank Insurance Fund. The Fund is a special trust fund created by the Missouri Legislature to provide insurance to service station owners for the cleanup costs associated with spills and leaks from underground petroleum storage tanks. The Fund investigated the leak and determined that a significant amount of gasoline had leaked into the soil surrounding McCall's tank system.

McCall and the Fund hired Bob Fine, an environmental engineer, to determine the extent of the leakage. In October of 1997, Fine notified that Department of Natural Resources ("DNR") that the leaking tank system on McCall's property had caused petroleum contamination to migrate off site in a northwesterly direction toward a nearby creek. Additional reports from Fine indicated that contamination had been detected north of the creek. Fine prepared a plan to

---

[1] Statutory citations refer to the 2000 edition of the Revised Statutes of Missouri, updated through the 2013 Cumulative Supplement.

2

contain and monitor the leak. Fine installed several monitoring wells on the streets that were contiguous to the service station.

In 2000, McCall sold the service station to Fleming Petroleum.

In 2003, the City of Harrisonville determined that its sewer system needed to be upgraded to provide increased capacity to accommodate its growing population. Harrisonville residents approved a bond issue for a multi-million-dollar sewer upgrade project. The sewer project called for the City to replace about one and one-half miles of its existing sewer line with larger diameter pipe. Part of the new pipe was to be laid under the street adjacent to Fleming's service station. Another part of the new pipe was to be laid adjacent to the creek on the north side of the service station. The City hired George Butler & Associates, a local engineering firm, to design the project and prepare a scope of services so that the construction work could be let for competitive bidding.

Rose-Lan Construction won the bidding process and was engaged by the City to complete the sewer project. During construction, Rose-Lan encountered contaminated soil adjacent to Fleming's service station. Rose-Lan did not have the expertise to complete construction in contaminated soil; it declined to complete this portion of the sewer project.

The City notified DNR of the contaminated soil, and was informed that the Fund had retained Fine to monitor the contamination since 1997, when it was first discovered. The Fund was contacted and hired Fine to determine whether gasoline from the service station was responsible for the soil contamination in the City's sewer easement. Fine confirmed that the service station was the source of the contamination.

The City began discussions with the Fund on the best way to address the contaminated soil, and complete construction of the sewer upgrade project. Ted Martin, the City's engineer,

3

estimated that to completely remove and replace the contaminated soil would cost in excess of $500,000. A more cost-effective approach, suggested by Fine and the Fund, involved leaving the contaminated soil in place, and substituting petroleum-resistant pipe and fittings for the sewer pipe the City had intended to install. Fine and BV Construction submitted a bid of $190,226.38 to install the petroleum-resistant pipe.

Pat Vuchetich, an employee with Williams and Company, the Fund's third-party administrator, concluded that the Fine/BV Construction estimate was too high, and made efforts to find a cheaper bid. Vuchetich contacted three companies he knew were capable of completing this type of remediation work. Ultimately, he decided that Midwest Remediation was best suited for the project, based on his prior experience with the company. Vuchetich spoke to Shaun Thomas of Midwest Remediation, and requested that Midwest Remediation prepare a bid for the project. Vuchetich worked with Thomas to prepare a low bid, making suggestions about specific cost items. Vuchetich indicated that with the changes Midwest's bid would "knock the socks off" of the City, and that he "would be a sure bet then to push the City to hire Midwest for the job." Midwest's bid, prepared by Thomas, was for $175,161.41, more than $15,000 lower than the Fine/BV Construction bid.

On April 13, 2004, Vuchetich forwarded Midwest's bid to Carol Eighmey, the Fund's executive director. Vuchetich indicated that the Fund's exposure would be $135,571 after subtracting Rose-Lan's estimated costs for the relevant section of pipe (which the City would avoid, since Rose-Lan would not be constructing this portion of the project). Vuchetich informed Eighmey that he would meet with the City and inform them that Midwest's costs were reasonable.

4

On April 15, 2004, the City held a meeting involving all of the parties involved in the remediation project. Vuchetich represented the Fund. The City was represented by Dianna Wright, the City Administrator, Martin, the City Engineer, and Steve Mauer, the City Attorney. Also in attendance at the meeting were Thomas, representing Midwest Remediation, and Willman Rextroat, representing Rose-Lan. Vuchetich presented Midwest's bid to the City officials and informed them that it was reasonable.

Vuchetich expressed concerns that Rose-Lan's initial bid for installing the relevant section of pipe ($19,061.31) was too low. In response, Rose-Lan revised the bid upward to $25,138.41 (which had the effect of reducing the amount of the contamination-related costs for which the Fund would be responsible). Vuchetich also stated that the Fund felt that both the City and George Butler & Associates should share some of the additional costs of the cleanup project based upon their failure to discover the soil contamination before preparing their sewer construction plan. The City responded that if the Fund had an issue with George Butler & Associates for failing to discover the contamination, the Fund should take it up with the firm, not with the City.

Wright, Martin, and Rextroat left the meeting with the understanding that the Fund wanted the City to hire Midwest Remediation for the project, and that the Fund would reimburse the City for Midwest Remediation's costs, less the amount that the City would otherwise have paid Rose-Lan for the affected portion of the sewer project.

Various discussions between the City and the Fund occurred over the following months. Vuchetich, on at least two occasions, made an offer of $50,000 to the City to settle the Fund's liability. The City authorized Rose-Lan to subcontract with Midwest Remediation to install the petroleum-resistant pipe with Change Order No. 3, dated August 3, 2004. On August 4, 2004,

the City's attorney sent a letter to Vuchetich stating that the City was going forward in reliance on his promise that the Fund would pay the full amount of Midwest Remediation's costs.

The Fund did not reimburse the City for the expenses associated with Midwest Remediation's work. The City filed suit against the Fund for fraudulent and negligent misrepresentation, alleging that the City had hired Midwest Remediation in reliance on the Fund's promise to pay Midwest Remediation's costs. The City also asserted claims for nuisance and trespass against McCall and Fleming, based on the migration of petroleum contamination from the underground petroleum tank system on the service station property. The City sought compensatory and punitive damages from each defendant.

A jury trial was conducted on the City's claims. During trial, the circuit court granted the City's motion for directed verdict on liability against McCall and Fleming, leaving only damages issues for jury determination on the City's nuisance and trespass claims.

The jury returned a verdict for the City on all claims. The jury awarded compensatory damages of $172,100.98 against McCall, Fleming and the Fund. The jury awarded punitive damages of $100 each against McCall and Fleming, and punitive damages of $8,000,000 against the Fund. The circuit court entered judgment accordingly.

McCall, Fleming and the Fund each filed post-trial motions. Among other things, the Fund argued that the $8,000,000 punitive damage award exceeded the cap on punitive damages found in § 510.265.1(2), and that it violated the due process requirements of the United States and Missouri Constitutions. The trial court refused to apply the statutory damages cap, because the City's cause of action had accrued before the cap was enacted in 2005. The court remitted the punitive damages award on due process grounds, however, reducing it from $8,000,000 to $2,500,000. The trial court denied the remaining post-trial motions.

6

McCall, Fleming and the Fund appeal. The City cross-appeals the trial court's remittitur of the punitive damages award.

## Analysis

McCall and Fleming filed a consolidated brief, which raises different substantive issues than the Fund. We first address the claims made by McCall and Fleming.

## I.

The trial court granted a directed verdict finding McCall and Fleming liable for nuisance and trespass; the only issue submitted to the jury concerned the City's recoverable damages. The jury awarded actual damages of $172,100.98 on each claim. Because the separate damage awards are duplicative, the trial court's judgment awarded the City a single recovery of $172,100.98 in compensatory damages against both McCall and Fleming, as well as punitive damages of $100 against each defendant.

On appeal, McCall and Fleming do not challenge the trial court's liability finding. Instead, their three Points relate to the trial court's rulings on the City's damages claim.

McCall and Fleming first argue that the trial court erred in submitting Jury Instructions No. 7 and 9, the damages instructions on the City's nuisance and trespass claims. Both instructions authorized the jury to award the City "the reasonable cost of remediation of the contaminated soil," as well as "any consequential damages resulting from" the nuisance or trespass. McCall and Fleming argue that the instructions erroneously told the jury that it could award the City its "consequential damages."

> Whether a jury is properly instructed is a matter of law subject to *de novo* review by this court. The court will determine if the instruction is supported by substantial evidence by viewing the evidence in a light most favorable to the instruction and disregard contrary evidence. The party challenging the instruction must show that the instruction misled, misdirected, or confused the jury, and that prejudice resulted from the error. A trial court's instructional error is reversible if the error substantially prejudiced a party.

7

*Syn, Inc. v. Beebe*, 200 S.W.3d 122, 128 (Mo. App. W.D. 2006) (citations omitted).

If a Missouri Approved Instruction ("MAI") is applicable in a particular case, that instruction must be given "to the exclusion of any other instruction on the same subject." Rule 70.02(b). "The law is well-settled that where an MAI instruction applies to the case, the use of such instruction is mandatory." *Syn, Inc.*, 200 S.W.3d at 128 (citation omitted). Missouri Approved Instructions do not exist for every particular legal issue, however. In cases in which a "not-in-MAI" instruction must be given to fairly submit the issues in a particular case, "such modifications or such instructions shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." Rule 70.02(b); *see also Shutt v. Chris Kaye Plastics Corp.*, 962 S.W.2d 887, 889-90 (Mo. banc 1998). "To obtain reversal of a jury verdict on grounds of instructional error, Appellants must show that: 1) the offending instruction misdirected, misled or confused the jury, and 2) prejudice resulted from the error." *Holder v. Schenherr*, 55 S.W.3d 505, 507 (Mo. App. W.D. 2001) (citation omitted). The party alleging error bears the burden of proof. *Id.*

Although McCall and Fleming's Point Relied On challenges the jury instructions submitted on both the City's nuisance and trespass claims, the authority they cite addresses only the damages recoverable in a common-law trespass action. We limit our discussion accordingly.

"There are no approved MAI instructions for trespass to land." *Sterbenz v. Kansas City Power & Light Co.*, 333 S.W.3d 1, 13 (Mo. App. W.D. 2010). McCall and Fleming argue that the trial court inappropriately relied on *Sterbenz* to support its modification of MAI 4.02 to authorize the recovery of "consequential damages." They argue that *Sterbenz* is limited to trespass claims against public utilities possessing the power of eminent domain, and which are

8

subject to § 523.283.4 (which recognizes a trespass cause of action against public utilities which improperly use easements or rights-of-way).

We do not believe *Sterbenz* is limited in the manner McCall and Fleming contend. *Sterbenz* holds that a public utility may be subject to a common-law trespass claim for certain unauthorized uses of another's land. 333 S.W.3d at 7-8. *Sterbenz* specifically states that, "[i]n *any* trespass action, the measure of damages could be modified to permit recovery of consequential damages supported by the evidence, beyond the applicable trespass measure of damages." *Id.* at 14 n.20 (emphasis added).

*Sterbenz*'s observation that a plaintiff in a common-law trespass action may recover consequential damages, beyond the diminution in market value of its property, or the cost to restore the property to its former condition, is consistent with well-established Missouri caselaw decided outside the public-utility context. Those decisions recognize that "'[a] trespasser is liable for all damages proximately caused by his trespass.'" *Brand v. Mathis & Assoc.*, 15 S.W.3d 403, 406 (Mo. App. S.D. 2000) (quoting *Crook v. Sheehan Enters., Inc.*, 740 S.W.2d 333, 336 (Mo. App. E.D. 1987)). For example, in *Kitterman v. Simrall*, 924 S.W.2d 872 (Mo. App. W.D. 1996), we stated that a trespasser is "liable for damages for the natural, necessary, direct, and proximate consequences of his wrongful act," *id.* at 878 (citation and internal quotation marks omitted); we held that the trespasser in that case could properly be held liable for plaintiff's temporary loss of access to a portion of its property. Similarly, in *Shady Valley Park & Pool, Inc. v. Fred Weber, Inc.*, 913 S.W.2d 28 (Mo. App. E.D. 1995), which involved trespass to a lake through the introduction of mud and silt from a highway construction project,

9

the Eastern District held that the plaintiff could recover damages resulting from the consequent closure of its wholesale fish hauling and fee fishing businesses. *Id.* at 35.[2]

Thus, substantive trespass law authorizes the recovery of consequential damages proximately caused by a trespass. The trial court's damages instruction did not misstate Missouri trespass law.

McCall and Fleming also argue that the inclusion of the phrase "consequential damages" in the damages instructions gave the jury a "roving commission"; they argue that "consequential damages" should have been defined in the instruction, to exclude the sort of "economic damages" which they contend the City was seeking to recover.

We first note that McCall and Fleming did not object on the record to the lack of a definition of "consequential damages" in the relevant instructions; because they did not make a specific objection on this basis, they failed to preserve the issue. *See* Rule 70.03; *Edwards v. Gerstein*, 363 S.W.3d 155, 167-68 (Mo. App. W.D. 2012); *McGuire v. Kenoma, LLC*, 375 S.W.3d 157, 173-74 (Mo. App. W.D. 2012).[3]

We turn, then, to McCall and Fleming's contention that the reference to "consequential damages" in Instructions No. 7 and 9 constituted a "roving commission." "A 'roving commission' occurs when an instruction assumes a disputed fact or submits an abstract legal question that allows the jury to roam freely through the evidence and choose any facts which suit

---

[2]      Although McCall and Fleming do not cite authority to support their claim that consequential damages are not recoverable on a *nuisance* claim, and we therefore need not decide the issue, we note that the damages recoverable for common-law nuisance appear similar to those recoverable in a trespass action. *See*, *e.g.*, *Brown v. Cedar Creek Rod & Gun Club*, 298 S.W.3d 14, 21 (Mo. App. W.D. 2009) (measure of damages for nuisance includes "actual damages for any diminished property value and compensatory damages for physical injuries, property damage, inconvenience, and discomfort caused by the nuisance").

[3]      For the same reason, we do not address McCall and Fleming's argument that the trial court improperly submitted damages instructions based on MAI 4.02, rather than MAI 4.01.

10

its fancy or its perception of logic to impose liability." *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 766 (Mo. banc 2010) (quoting *Scanwell Freight Express STL, Inc. v. Chan*, 162 S.W.3d 477, 482 (Mo. banc 2005)).  In determining whether a jury instruction failed to give the jury meaningful guidance, but instead constituted a "roving commission," "[t]he issue is whether the phrase as used in the verdict director was misleading *in the context of the evidence at trial*." *Id.* at 767 (emphasis added; citing *Edgerton v. Morrison*, 280 S.W.3d 62, 67 (Mo. banc 2009)). "Where the testimony in a case explains a phrase used in the verdict director, there is no 'roving commission.'" *Id.* (citing *Edgerton*, 280 S.W.3d at 67).

In this case, the testimony at trial made clear precisely what damages the City was seeking to collect, which it alleged were proximately caused by the petroleum contamination. Dianna Wright, Harrisonville's former City Administrator, testified at trial to the City's damages.  Wright testified that the City was required to hire Midwest Remediation to address the contaminated soil and install petroleum-resistant piping in the area where the contamination had been discovered, because Midwest Remediation was qualified to deal with the petroleum contamination, and Rose-Lan was not.  Wright testified that Midwest Remediation charged the City $155,257.98 more than Rose-Lan had contracted to charge for completion of the sewer upgrade project in the contaminated area.  Wright testified that these additional costs were a direct result of the soil contamination.  She also testified that the City incurred additional costs of $4,660 for soil testing to determine the scope of the contamination, and $12,183 in additional fees to George Butler & Associates due to the increased scope of the sewer project caused by the soil contamination.  Wright testified that the sum of these costs to the City, a total of $172,100.98, was the City's damages directly resulting from the soil contamination.  Finally, she testified that without the soil contamination, the City would have incurred only $25,135.41 for

11

construction of the sewer upgrade in the contaminated area. The testimony of William Rextroat of Rose-Lan confirmed that it would have charged the City only $25,135.41 for this portion of the sewer project, but for the discovery of the petroleum contamination.

Thus, Wright's testimony establishes that the City incurred increased costs of $172,100.98 to complete the sewer upgrade project, as a direct result of the contamination for which McCall and Fleming are responsible. None of the costs for which the City sought reimbursement would have been incurred had the City not encountered petroleum-contaminated soil. The increased costs to which Wright testified are the costs for which the City sought compensation in its closing arguments, and the jury awarded the City compensatory damages in this precise amount. Under the caselaw discussed above, the City was entitled to recover these costs, which were proximately caused by the trespass of contaminants into its easement. In these circumstances, the reference to "consequential damages" in Instructions No. 7 and 9 was sufficiently definite to inform the jury of the legal standard it was required to apply. The instructions did not constitute a prohibited "roving commission."

McCall and Fleming argue that the City was improperly seeking to recover "economic damages." They rely on the following exchange from Wright's testimony:

> Q.  . . . So . . . the difference in the money you paid [to Midwest Remediation] and the money that Rose-Lan said they would have spent, that represented the loss of the benefit of your good bargain with Rose-Lan; is that your understanding?
>
> A.  That's my understanding.

McCall and Fleming claim that this exchange establishes that the City was seeking "benefit of the bargain" damages, rather than recovery of only those costs which were directly attributable to the petroleum contamination.

12

We are unpersuaded.  In agreeing with McCall and Fleming's counsel that part of the City's damages reflected "the loss of the benefit of [the City's] good bargain with Rose-Lan," Wright was merely testifying that, due to the petroleum contamination, the City could no longer construct this portion of the sewer upgrade project at the lower costs to which Rose-Lan had agreed, but instead had to hire a specialized contractor, to perform only part of the sewer upgrade project, at a much higher cost.  Although McCall and Fleming's counsel asked his questions in terms of "benefit of the bargain," Wright's response is consistent with the remainder of her testimony:  the City could have had the relevant work performed at a much lower price, but for the discovery of the contamination.  We do not read the isolated excerpt from Wright's testimony on which McCall and Fleming rely as altering the tenor of Wright's overall testimony, or as permitting the City to recover any sort of impermissible "benefit of the bargain" damages.[4]

Point I is denied.

## II.

In their second Point, McCall and Fleming argue that the trial court abused its discretion by failing to grant their motions for a directed verdict and for judgment notwithstanding the verdict, which sought to limit the City's compensatory damages to $72,009.98.  McCall and Fleming argue that there was no competent evidence that the damages attributable to the contamination exceeded that amount.  We disagree.

---

[4]	We recognize that the City's installation of petroleum-resistant pipe and fittings did not serve to remediate the contaminated soil, but instead allowed the City to complete its sewer upgrade project while leaving the contaminated soil in place.  McCall and Fleming do not argue, however, that the City's costs were unrecoverable because they were not incurred to directly address the contaminated soil itself.  Moreover, the evidence at trial indicated that the cost to remediate the contamination – by excavation and disposal of all contaminated soils – was almost three times the damages the City actually recovered.

"The standard of review for the denial of a judgment notwithstanding the verdict (JNOV) is essentially the same as review of the denial of a motion for directed verdict." *All Am. Painting, LLC v. Fin. Solutions & Assocs., Inc.*, 315 S.W.3d 719, 723 (Mo. banc 2010).

> A defendant is entitled to a judgment notwithstanding the verdict only when the plaintiff fails to make a submissible case. To make a submissible case, a plaintiff must present substantial evidence for every fact essential to liability. Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case.
>
> In reviewing for a submissible case, the evidence and all reasonable inferences drawn therefrom are viewed in the light most favorable to the plaintiff. The plaintiff's evidence is presumed to be true. Any of the defendant's evidence that does not support the plaintiff's case is disregarded. An appellate court will not, however, supply missing evidence or give the plaintiff the benefit of unreasonable, speculative or forced inferences. Whether the evidence in a case is substantial and whether the inferences drawn therefrom are reasonable are questions of law. Granting a JNOV is a drastic action that should be done only when reasonable persons could not differ on a correct disposition of the case. An appellate court will not overturn a jury's verdict unless there is a complete absence of probative facts to support it.

*Porter v. Toys 'R' Us-Delaware, Inc.*, 152 S.W.3d 310, 315-316 (Mo. App. W.D. 2004) (citations and internal quotation marks omitted).

McCall and Fleming claim that the only evidence on which the jury could have relied to determine the City's damages was the testimony of Shaun Thomas, a former employee of Midwest Remediation who prepared its bid for the work at issue. (Midwest Remediation was defunct by the time of trial). When asked by McCall and Fleming's counsel, Thomas testified that only $72,009.98 of Midwest Remediation's bid of $175,161.44 was directly attributable to the soil contamination at the site.

Despite Thomas' testimony, as we have discussed above the City submitted evidence, through the testimony of City Administrator Wright, that all of the damages it was seeking to recover resulted from the necessity to hire Midwest Remediation to construct a portion of the

14

sewer upgrade project which Rose-Lan was not qualified to perform, due to the discovery of petroleum contamination. Furthermore, the City's evidence indicated that the Fund recommended Midwest Remediation and viewed its bid as "reasonable" for the work needed. Even if Thomas' testimony were viewed as inconsistent with the City's evidence, any inconsistency was for the jury to resolve. Under our standard of review, we disregard evidence contrary to the jury's verdict, and presume that the jury resolved any inconsistency in the evidence by relying on Wright's testimony that all of the City's damages had been proximately caused by the soil contamination.

We also note that Thomas' testimony was equivocal; the jury had every reason to discount it. Thomas testified that he and spent "very little" time attempting to distinguish the contamination-related from the non-contamination-related costs in Midwest Remediation's bid. Indeed, on cross-examination Thomas estimated that his analysis took him only "about eight minutes" to complete.

Thomas also testified that he categorized Midwest Remediation's costs "from memory," seven years after he prepared its bid. Because Midwest Remediation was defunct, Thomas testified that "I don't have a file and don't know where to look for a file." When he was asked what total amount of costs he calculated as being "specific . . . to the job because of dealing with contaminated soil," Thomas provide the following ambivalent response:

> A.   Well, from the ones marked with an X and you highlighted, we come up with 72,000. But, you know, there's – there's things within the whole quote that – just bits and pieces that just, in a short amount of time that I spent on this, I can't specifically say. But that's the amount, $72,009.88 is what I come up with.

> Q.   And do you believe that is a fair representation of the portion of the total job that was specifically necessary to do dealing with the contaminated soil?

A.      Well, that's what I've – that's what I've attributed it to.  So I don't know if it's fair or not, but, yes, I guess it would be.

In addition, on cross-examination Thomas acknowledged that *other* costs, beyond those which he had specifically identified as contamination-related, were affected by the fact that contamination was present in the work zone.  For example, Thomas agreed that, even though Rose-Lan would have had to lay pipe in the affected area even if no contamination had been discovered, Midwest Remediation's pipe-laying work was different, since it was required to "put[ ] in a new pipe in a contaminated trench."  Thomas agreed that comparing the work Midwest Remediation did in contaminated soil, to the work Rose-Lan would have done if the area had not been contaminated, "isn't really apples to apples."

McCall and Fleming's argument also ignores that Midwest Remediation's costs were undoubtedly affected by the fact that it was specially retained to perform a small part of a larger, ongoing construction project.  Presumably,[5] some of Midwest Remediation's costs were duplicative; thus, Midwest Remediation likely incurred costs (whether for mobilization or demobilization, equipment rental, bonding, insurance, or other matters) that would not have been separately incurred by a second contractor if Rose-Lan had been able to complete the entire sewer upgrade project as originally planned.  Moreover, we presume that, because it had been hired to perform only a part of a larger construction project, Midwest Remediation's per-unit costs for performance of the work exceeded Rose-Lan's per-unit cost.  The testimony also indicated that Midwest Remediation was qualified to conduct construction work in the contaminated area, but that Rose-Lan was not; presumably Midwest Remediation was required

[5]      The Fund did not submit to this Court Defendant's Exhibit 199, which is apparently the line-item breakdown of Midwest Remediation's costs on which Thomas' testimony depended.  The Fund's failure to provide us with this exhibit makes it difficult to fully respond to the Fund's argument.  The omission of this exhibit from the record on appeal must be construed against the Fund. *See*, *e.g.*, *Dawson v. Dawson*, 366 S.W.3d 107, 113 (Mo. App. W.D. 2012) (citing *U.S. Bank v. Lewis*, 326 S.W.3d 491, 496 (Mo. App. S.D. 2010)).

16

to employ more highly skilled (and thus more expensive) personnel than Rose-Lan. Thomas also testified that the City and Rose-Lan stressed to him the urgency of Midwest Remediation's work, based on their desire to complete the ongoing sewer upgrade project; Thomas testified that this urgency "played a role" in the amount Midwest Remediation bid for the work.

Thomas' equivocal testimony as to the amount of Midwest Remediation's costs which he could specifically identify as being contamination-related did not foreclose the jury from crediting the City's evidence concerning its contamination-related costs. The trial court did not err in denying McCall and Fleming's motions for directed verdict and for judgment notwithstanding the verdict.

### III.

McCall and Fleming's third Point argues that the trial court erred in not ordering remittitur of the jury award of $172,100.98 in compensatory damages, based on Thomas' testimony that Midwest Remediation's contamination-related costs were only $72,009.98. We disagree.

> The trial court is given broad discretion in deciding whether remittitur should be ordered. The appellate court will interfere only when the verdict is so excessive it shocks the conscience of the court and convinces the appellate court that both the jury and the trial court abused its discretion. In reviewing whether a verdict is excessive, we are limited to a consideration of the evidence which supports the verdict excluding that which disaffirms it.

*McGathey v. Davis*, 281 S.W.3d 312, 320 (Mo. App. W.D. 2009) (internal quotation marks and citations omitted).

As explained in § II, above, Thomas' testimony concerning Midwest Remediation's contamination-related costs was equivocal, and it did not foreclose the jury from awarding the City the greater amount it sought. Because substantial evidence supported the jury's

compensatory damage award, the trial court did not abuse its "broad discretion" in refusing to remit the compensatory damages awarded against McCall and Fleming. Point III is denied.

## IV.

We turn now to the Fund's arguments. In its first Point, the Fund argues that the trial court erred in failing to grant its motion for judgment notwithstanding the verdict ("JNOV") on the City's fraudulent and negligent misrepresentation claims. The Fund argues that it was entitled to JNOV because the City could not have actually or justifiably relied on any statements made by Vuchetich at the April 15, 2004 meeting that the Fund would indemnify the City for the entirety of Midwest Remediation's net costs. The Fund argues that such reliance was foreclosed by Vuchetich's later correspondence to the City and to George Butler & Associates, in which he offered $50,000 to settle the Fund's liability, and stated that George Butler & Associates should be required to contribute to funding the cleanup. Because the City had Vuchetich's post-April 15 correspondence at the time it authorized Rose-Lan to subcontract with Midwest Remediation, the Fund argues that the City could not have actually, or reasonably, believed that the Fund would pay all of Midwest Remediation's expenses at the time the City chose to retain it.

The Fund made this argument (that Vuchetich's post-April 15, 2004 correspondence prevented actual and justifiable reliance) in its post-trial motion for judgment notwithstanding the verdict. It failed, however, to make this argument at trial in its oral motions for directed verdict at the close of the City's evidence, or at the close of all the evidence. At the end of the City's case, the Fund argued that it was entitled to a directed verdict on the City's fraud and negligent misrepresentation claims because: there was no evidence that Vuchetich made a specific, actionable representation at the April 15, 2004 meeting; the City had failed to prove that the Fund and/or Vuchetich had a present intention not to perform at the time any representation was made; and the City suffered no detriment from any reliance on Vuchetich's representations,

18

because Midwest Remediation "did a fine job," and saved the City money compared to the Fine/BV Construction bid. No reference was made to Vuchetich's post-April 15, 2004 correspondence, and no argument was made that the correspondence defeated the City's claims of actual and justifiable reliance on Vuchetich's representations at the April 15, 2004 meeting.

The Fund's motion for directed verdict at the close of all the evidence repeated its earlier arguments, largely by incorporating the earlier arguments by reference.

Because the Fund failed to move for a directed verdict during trial on the basis asserted in its first Point, it did not preserve that issue as a basis for JNOV, or for appellate review.

> A motion for judgment notwithstanding the verdict is a motion "to have judgment entered in accordance with the motion for a directed verdict." Rule 72.01(b). Therefore, a sufficient motion for directed verdict is required to preserve the motion for judgment notwithstanding the verdict and for appeal. [¶] ***An issue not raised in a motion for directed verdict may not be used to seek a judgment notwithstanding the verdict on that issue or for obtaining appellate review of the trial court's denial of judgment notwithstanding the verdict on that ground***.

*Daniels v. Bd. of Curators of Lincoln Univ.*, 51 S.W.3d 1, 5–6 (Mo. App. W.D. 2001) (emphasis added; other citations and footnote omitted). Rule 72.01(a) provides that "[a] motion for a directed verdict shall state the specific grounds therefor." "In the absence of a motion for directed verdict which complies with the mandates of Rule 72.01(a), a post-verdict motion for judgment n.o.v. is without basis and preserves nothing for review." *Pope v. Pope*, 179 S.W.3d 442, 457 (Mo. App. W.D. 2005) (en banc); *see also*, *e.g.*, *Bailey v. Hawthorn Bank*, 382 S.W.3d 84, 100 (Mo. App. W.D. 2012).

Because it was not preserved in the Fund's motions for directed verdict during trial, we reject the Fund's first Point without further discussion.

19

## V.

In its second Point, the Fund argues that the trial court erred in denying its motion for JNOV because the evidence establishes that the City did not suffer any damages associated with the sewer project. We disagree.

As explained in § II, above, a JNOV is appropriate only when a plaintiff fails to make a submissible case; in determining whether a plaintiff did so, we view the evidence, and all reasonable inferences from the evidence, in the light most favorable to the verdict, and disregard all contrary evidence. *Porter*, 152 S.W.3d at 315-316.

In fraudulent misrepresentation cases, the plaintiff is required to establish each and every element of a fraud claim, and its failure to do so is fatal to the claim. *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. banc 1988) (citation omitted). An injury directly and proximately caused by the misrepresentation is an essential element of a fraudulent misrepresentation claim. *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. banc 2007) (citation omitted).

The Fund argues that, even if the City relied on Vuchetich's representations that the Fund would reimburse the cost of hiring Midwest Remediation, the result was that the City actually saved money, because Midwest Remediation's bid was less than the Fine/BV Construction bid for the same work. Thus, according to the Fund, the City sustained no compensable damages as a matter of law. The Fund's argument ignores, however, that the City presented evidence that it would have acted differently if Vuchetich had not promised that the Fund would pay Midwest Remediation's fees. Former City Administrator Dianna Wright testified that if she would have been told that the Fund was not going to pay for all of the costs in excess of Rose-Lan's contract price, she would have told the Fund to "come and get your contaminated soil, and get it out of our easement, and completely remove it, clean it up, get a certification that it's now clean." She

20

testified that the City would then have had Rose-Lan complete the sewer installation as originally planned. City Engineer Ted Martin provided similar testimony. The evidence indicated that the cost of excavation of all contaminated soils would have been approximately $500,000.

Beyond the fact that the City did not insist on complete excavation of all contaminated soil, its evidence indicates that it authorized Rose-Lan to subcontract with Midwest Remediation, without conducting a competitive bidding process, based on Vuchetich's assurances. Rose-Lan's William Rextroat testified that after the April 15, 2004 meeting, the Fund "pretty much demanded that we use their number and use them [*i.e.*, Midwest Remediation]." When asked why the City did not go through a competitive bidding process before hiring Midwest, Rextroat testified that "[t]he tank fund was happy with those guys. We didn't have anything against them, either, so it was fine with us."

Based upon the preceding facts, the City presented substantial evidence to allow the trier of fact to find that the City relied on the Fund's representations when it decided: to hire Midwest Remediation at all; to hire them without a competitive bidding process; and to accept the less costly alternative of leaving much of the contaminated soil in place, rather than excavating all of it. The trial court did not err in denying the Fund's motion for a directed verdict based upon the alleged lack of evidence that the City relied on Vuchetich's representations to its detriment.[6]

---

[6] In its appellate briefing, the Fund argues that the City's fraud claim is in essence a claim that the Fund breached an oral contract to reimburse the City for Midwest Remediation's costs; the Fund contends that the City was required to prove that it incurred damages on its fraud claim separate and apart from the breach of oral contract claim the Fund contends the City *could have* asserted. This argument was not made in the Fund's directed verdict motions; for the reasons stated in § IV, above, we do not address this unpreserved argument.

The Fund's argument is that the City incurred *no* harm as a result of its reliance on Vuchetich's representations; the Fund does not argue that the City's recovery was based on an inappropriate *measure* of its harm, or that the City was allowed to recover for damages which were not proximately caused by Vuchetich's misrepresentations.

21

## VI.

In its third Point, the Fund argues that the trial court erred in failing to grant its motion for JNOV because the jury's award of actual and punitive damages violated § 319.131.5, which specifies the types of damages for which the Fund will compensate tank owners and operators and third parties.

"Statutory interpretation is a question of law, which is subject to *de novo* review on appeal." *Hervey v. Missouri Dept. of Corr.*, 379 S.W.3d 156, 163 (Mo. banc 2012) (citation omitted).

The Fund is a special trust fund created by statute to cover the costs of cleaning up contamination caused by leaking underground petroleum storage tanks. § 319.129.1. The statute specifies that:

> The fund shall provide coverage for third-party claims involving property damage or bodily injury caused by leaking petroleum storage tanks whose owner or operator is participating in the fund at the time the release occurs or is discovered. Coverage for third-party property damage or bodily injury shall be in addition to the coverage described in subsection 4 of this section [(addressing cleanup costs)] but the total liability of the petroleum storage tank insurance fund for all cleanup costs, property damage, and bodily injury shall not exceed one million dollars per occurrence or two million dollars aggregate per year. *The fund shall not compensate* an owner or operator for repair of damages to property beyond that required to contain and clean up a release of a regulated substance or compensate an owner or operator or *any third party* for loss or damage to other property owned or belonging to the owner or operator, or *for any loss or damage of an intangible nature, including*, but not limited to, loss or interruption of business, pain and suffering of any person, lost income, mental distress, loss of use of any benefit, or *punitive damages*.

§ 319.131.5 (emphasis added).

The Fund argues that the statutory prohibition on compensation for "loss or damage of an intangible nature, including . . . punitive damages," prohibited the jury from awarding the City either compensatory or punitive damages.

22

With respect to actual damages, for the reasons stated in § I, above, we reject the Fund's argument that the City was seeking "economic" or "benefit of the bargain" damages. Instead, as we explained in § I, the City presented evidence that all of the damages it sought to recover were directly attributable to the petroleum contamination.

More fundamentally, however, we do not read § 319.131.5 as specifying limitations on the Fund's liability for its own actions. The first two sentences of § 319.131.5 make clear that the sub-section is intended to define the "coverage" provided by the Fund; namely, the *insurance* or *indemnity* coverage which the Fund provides for property damage or bodily injury "caused by leaking petroleum storage tanks" which are insured by the Fund. Nothing in § 319.131.5 suggest that it is intended to address the scope of the Fund's liability *for its own actions*.

This is confirmed by the immediately preceding and succeeding sections of the statute. Section 319.131.4 specifies the monetary limits of the Fund's liability for cleanup costs "associated with a release from a petroleum storage tank." The following section (§ 319.131.6) specifies that, "within limits specified in this section," the Fund shall provide a defense to, and assume the cost of, third-party claims and cleanup costs "caused by releases from petroleum storage tanks." Once again, these provisions refer to contamination-related costs, and contamination-related claims, *not* to any claims or liabilities imposed on the Fund directly, for its own conduct.

"In determining the legislature's intent, we are to read the statute as a whole and *in pari materia* with related sections." *Heslop v. Sanderson*, 123 S.W.3d 214, 222 (Mo. App. W.D. 2003) (citation omitted). Reading § 319.131.5 as a whole, and in conjunction with the preceding and succeeding sections, we conclude that the statement that "[t]he fund shall not compensate . . . any third party . . . for any loss or damage of an intangible nature, including . . . punitive

23

damages" defines the scope of the Fund's insurance or indemnity coverage. Read in context, the phrase prohibits the fund from "compensat[ing]" or indemnifying owners or operators, or third parties, for punitive damages assessed as a result of a release from a petroleum storage tank. The quoted phrase does *not* address punitive damages awarded directly against the Fund for its own conduct in resolving an underlying indemnity claim.[7] Section § 319.131.5 did not prevent the trial court from entering judgment against the Fund for compensatory and punitive damages based on its own fraud or negligent misrepresentations.[8]

**VII.**

The Fund's fourth Point argues that the statements made by Vuchetich on April 15, 2004, were too vague and uncertain to support a cause of action for fraudulent or negligent misrepresentation, and that Instructions No. 14 and 17, which submitted the City's fraud and negligent misrepresentation claims based upon the April 15, 2004 statements, gave the jury an impermissible roving commission.

The City presented substantial evidence that Vuchetich's representation, that the Fund would pay "the costs to remove the petroleum contamination," was neither vague nor uncertain. Wright, Rextroat, and Martin all testified that they understood Vuchetich's statements at the April 15, 2004 meeting to mean that the Fund would pay for all costs incurred by the City, above what Rose-Lan would have charged, if it hired Midwest Remediation to construct the sewer upgrade in the contaminated area. Wright testified that, at the April 15, 2004 meeting, Vuchetich

---

[7]    In a similar vein, liability insurance policies are frequently read to exclude coverage for punitive damages. *See*, *e.g.*, *DeShong v. Mid-States Adjustment, Inc.*, 876 S.W.2d 5, 7 (Mo. App. W.D. 1994); *Heartland Stores, Inc. v. Royal Ins. Co.*, 815 S.W.2d 39, 42-43 (Mo. App. W.D. 1991); *Schnuck Mkts., Inc. v. Transam. Ins. Co.*, 652 S.W.2d 206, 208-11 (Mo. App. E.D. 1983). Yet we are unaware of any case in which an insurer contended that such contractual limits on its *indemnity obligations* limited the insurer's tort liability for its own actions, such as its bad-faith failure to resolve an insurance claim.

[8]    The Fund has not argued that it is entitled to sovereign immunity from the City's tort claims, and we therefore do not address the issue.

24

spent "an enormous amount of time . . . talking about what some of those [specific contamination-related expenses] were," including discussions about the need for petroleum-resistant piping and petroleum-resistant fittings, the need to dispose of the contaminated dirt removed from the area where the pipe would lay, and the need for new bonds to cover the project's increased cost. Vuchetich's representations at the April 15, 2004 meeting were not so uncertain or vague as to defeat the City's fraud and negligent misrepresentation claims.

The instructions submitting the City's fraud and negligent misrepresentation claims did not give the jury a "roving commission." The instructions told the jury that its "verdict must be for the City if you believe . . . that on April 15, 2004 [the Fund] represented to the City that [the Fund] would pay the costs to remove the petroleum contamination from the City's property if the City used Midwest Remediation as a contractor . . . ." The Fund asserts that because the statement does not further define "costs to remove the petroleum contamination," it gave the jury no guidance. However, as explained in § I, above, in deciding whether a jury instruction constituted a "roving commission," "[t]he issue is whether the phrase as used in the verdict director was misleading *in the context of the evidence at trial*." *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 767 (Mo. banc 2010) (emphasis added; citing *Edgerton v. Morrison*, 280 S.W.3d 62, 67 (Mo. banc 2009)). "Where the testimony in a case explains a phrase used in the verdict director, there is no 'roving commission.'" *Id.* (citing *Edgerton*, 280 S.W.3d at 67).

As we have explained above, the City presented evidence that both it and the Fund understood that "the costs to remove the petroleum contamination" consisted of Midwest Remediation's costs, less the amount the City would have paid Rose-Lan for the relevant work, plus any incidental additional costs the City incurred. In light of this evidence, the statement in

25

the jury instructions was specific enough to allow the jury to decide if it believed the City's evidence. There was no "roving commission."

## VIII.

In its fifth Point, the Fund argues that the trial court abused its discretion by excluding evidence of settlement discussions between the Fund and the City following the April 15, 2004 meeting. The Fund argues that these settlement offers were relevant to mitigate the Fund's exposure to punitive damages, since they would demonstrate that the Fund was making good-faith efforts to resolve its dispute with the City.

At the outset, we note that the Fund's Point Relied On attacks the trial court's "granting [of] the City's pre-trial Motion *in Limine*" excluding the parties' communications concerning the City's claim. But the grant of a pre-trial motion *in limine* is not appealable; instead, it is the exclusion of evidence *which is offered at trial* which is reviewable on appeal. The Missouri Supreme Court has only recently explained that "'[a] ruling in limine is interlocutory only and is subject to change during the course of the trial. The motion in limine, in and of itself, preserves nothing for appeal.'" *Smith v. Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623, 636 (Mo. banc 2013) (quoting *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992)). "Generally, in order to preserve an issue of exclusion of evidence for appeal, a definite and specific offer of proof demonstrating why the evidence is relevant and admissible must be made at trial." *Chamberlain v. Dir. of Revenue*, 342 S.W.3d 334, 339 (Mo. App. S.D. 2011) (internal quotation omitted). "When a motion in limine is granted so as to exclude evidence from trial, the party offering the evidence must still offer it at trial in order to preserve the issue for review on appeal." *Rogers v. Hester ex rel. Mills*, 334 S.W.3d 528, 540 (Mo. App. S.D. 2010) (citing *Henderson v. Fields*, 68 S.W.3d 455, 469 (Mo. App. W.D. 2001)).

26

Because a ruling on a motion *in limine* is interlocutory, and by itself preserves nothing for review, "[a] point relied on that refers only to a ruling on a motion in limine is deficient." *Marquis Fin. Servs. of Ind., Inc. v. Peet*, 365 S.W.3d 256, 260 (Mo. App. E.D. 2012). Nevertheless, "[i]f the point does not impede disposition on the merits, we may review the point." *Id.* at 261; *see also*, *e.g.*, *Arrington v. Goodrich Quality Theaters, Inc.*, 266 S.W.3d 856, 863 (Mo. App. S.D. 2008).

Ignoring any technical deficiencies in the Fund's Point Relied On, we limit our review to the two documents which the Fund offered at trial, and whose exclusion it specifically challenges in its appellate briefing: Defendant's Exhibit 153C, a May 6, 2004 letter from Vuchetich to the City's attorney, which "propose[d] a settlement of $50,000 in exchange for a full release" of the Fund and the service station owners; and Defendant's Exhibit 194, a table prepared by the City, and provided to the Fund in a February 2005 meeting, which listed the City's total "damages" as $445,951.03, including $273,850.05 related to "Change Order No. 9."

> The admission or exclusion of evidence is within the sound discretion of the trial court. Where evidence is excluded, the issue is whether or not the trial court abused its discretion, not whether the evidence was admissible. A trial court abuses its discretion when the ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock one's sense of justice and indicates a lack of careful consideration. We give substantial deference to the trial court's decision to admit or exclude evidence because of its superior opportunity to evaluate the proffered evidence in the context of the trial.

*Romeo v. Jones*, 144 S.W.3d 324, 332 (Mo. App. W.D. 2004) (citations omitted).

Merely showing the trial court erred by excluding evidence is insufficient to justify reversal, without a showing that the erroneous ruling prejudiced the appellant. *Byers v. Cheng*, 238 S.W.3d 717, 726 (Mo. App. E.D. 2007). In particular, "the exclusion of evidence that is merely additional evidence of the same kind bearing upon the same point will not be considered prejudicial error upon appeal." *Id.* at 727 (quoting *Sampson v. Missouri Pacific R. Co.*, 560

27

S.W.2d 573, 590 (Mo. banc 1978)); *see also Adkins v. Hontz*, 337 S.W.3d 711, 720 (Mo. App. W.D. 2011) ("The exclusion of cumulative evidence is not considered prejudicial on appeal.").

Even assuming that the trial court erred in excluding Defendant's Exhibits 153C and 194, the Fund cannot establish that it was prejudiced by the exclusion, because other evidence was admitted at trial concerning both the Fund's May 6, 2004 settlement offer, and concerning the City's February 2005 assertion that it had incurred a total of $445,951.03 in damages.

Although Vuchetich's May 6, 2004 settlement letter (Defendant's Exhibit 153C) was not itself admitted into evidence, the trial court permitted the Fund to elicit testimony from Vuchetich that reported the letter's substance. During Vuchetich's direct examination, the Fund's counsel was permitted to show Vuchetich the May 6, 2004 letter to refresh his recollection. Based on his review of the letter, Vuchetich testified that, "prior to early May of 2004," he had "tr[ied] . . . to see if [he] couldn't help resolve these issues and get this matter put to rest . . . so that everybody would be happy." Vuchetich specifically testified that the Fund made a settlement offer of $50,000 to the City "in early May of 2004," in a letter addressed to the City's attorney; after reviewing the letter to confirm the date, Vuchetich testified that the letter was sent on May 6, 2004.

Similarly, the Fund's Executive Director, Carol Eighmey, testified that the Fund made a settlement offer of $50,000 to the City prior to the commencement of Midwest Remediation's work, which the City rejected, although Eighmey felt that if was "a very generous offer." Eighmey testified that, because the Fund "w[as] trying at the time to be reasonable," it "continued to try to discuss the matter with the City even after we made that offer."

In light of the testimony of Vuchetich and Eighmey, which essentially told the jury the entire relevant contents of Defendant's Exhibit 153C, we cannot find that the Fund was

prejudiced by the exclusion of Exhibit 153C, even on the assumption that the trial court's exclusion of the letter was erroneous.  Frankly, we are at a loss to identify any *additional* information that would have been put before the jury by physically admitting Exhibit 153C into evidence.

We reach a similar conclusion with respect to the February 2005 "Damages" table, Defendant's Exhibit 194, which listed the City's total "damages" as $445,951.03.  The difference between the compensatory damages the City sought at trial and which the jury awarded ($172,100.98) and the total figure on Defendant's Exhibit 194 ($445,951.03) is explained by the costs associated with "Change Order No. 9" ($273,850.05).  During the direct examination of City Administrator Wright, Change Order No. 9 was admitted into evidence.  Wright testified that Change Order No. 9 related to a southerly extension of the existing sewer system.  Wright testified that test bores discovered contaminated soils in the area where the City contemplated constructing this additional southerly extension.  The City obtained a cost estimate for construction of the southerly extension, in contaminated soils, of $273,850.05.  Wright testified that "[w]e had correspondence with [the Fund] [concerning this cost estimate], because we wanted to make sure they were aware of our findings, that we found contaminated soil, and that this would certainly be a potential reimbursement to them on the Big Tank claim."  Wright also testified, however, that the City ultimately did not construct the southerly extension reflected in Change Order No. 9, and that it was therefore not seeking compensation from the Fund for that amount.

On cross-examination, Wright acknowledged that the City informed the Fund of the $445,951.03 figure at a meeting on February 22, 2005; she testified that the City did so to "put[ ] them on notice that if we did the second phase, these were the estimated costs that we had to do

29

that particular project." In a similar vein, the Fund's Executive Director, Carol Eighmey, tesified that, in early 2005, "the City started asking again for lots and lots of money."

Given this testimony, Defendant's Exhibit 194 would have constituted "merely additional evidence of the same kind bearing upon the same point"; its exclusion "will not be considered prejudicial error upon appeal." *Byers*, 238 S.W.3d at 727.

**IX.**

In its sixth Point, the Fund argues that the trial court erred in submitting punitive damages to the jury because there was insufficient evidence of malicious conduct. We disagree.

> Whether there is sufficient evidence for an award of punitive damages is a question of law. We review the evidence presented to determine whether, as a matter of law, it was sufficient to submit the claim for punitive damages. In doing so, we view the evidence and all reasonable inferences in the light most favorable to submissibility.

*Perkins v. Dean Mach. Co.*, 132 S.W.3d 295, 299 (Mo. App. W.D. 2004) (citations and internal quotation marks omitted).

"Punitive damages are 'so extraordinary or harsh' that they should be awarded only sparingly and must be proven by clear and convincing evidence." *O'Riley v. U.S. Bank, N.A.*, 412 S.W.3d 400, 417 (Mo. App. W.D. 2013) (quoting *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 110 (Mo. banc 1996)). "'A submissible case for punitive damages requires clear and convincing proof that the defendant intentionally acted either by a wanton, willful or outrageous act, or reckless disregard for an act's consequences (from which evil motive is inferred).'" *Smith v. Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623, 630 (Mo. banc 2013) (quoting *Howard v. City of Kansas City*, 332 S.W.3d 772, 788 (Mo. banc 2011)).

Generally, a defendant who "acts in good faith and honestly believes that his act is lawful" cannot be held liable for punitive damages. *Tamko Asphalt Prods., Inc. v. Arch Assocs.*, 830 S.W.2d 434, 441 (Mo. App. E.D. 1992). However, malice or evil motive may be inferred

from the defendant's acts despite the contention that it was acting in good faith. *See Harrell v. Cochran*, 233 S.W.3d 254, 260 (Mo. App. W.D. 2007).

The City presented evidence that, at the April 15, 2004 meeting, Vuchetich advised the City that Midwest Remediation's estimate for completing the sewer upgrade project in the contaminated area was reasonable, and that the Fund would pay Midwest Remediation's costs, less the amount the City would avoid because Rose-Lan was not performing this portion of the project. Although City Administrator Wright testified that Vuchetich stated at the meeting that George Butler & Associates "should have known before the project began that there was a potential for contamination along the city's easement," the Fund never identified any costs that would have been saved if the engineering firm had acted more diligently. Wright testified that despite Vuchetich's complaints regarding George Butler & Associates' work, the conclusion at the meeting was that *the Fund* would pay the entire net cost to complete the sewer upgrade project in the affected area. In contrast to this evidence concerning Vuchetich's representations, the Fund's Executive Director Carol Eighmey testified that, even prior to the meeting, the Fund had no intention of paying the entire net cost, because of the Fund's belief that George Butler & Associates should bear part of the responsibility for the increased costs.

The City also presented evidence that, subsequent to the April 2004 meeting at which Vuchetich promised that the Fund would pay Midwest Remediation's net costs, the Fund raised a series of objections to the costs associated with the project. First, although Vuchetich had assured the City at the April 2004 meeting that Midwest Remediation's estimate was reasonable, City Adminstrator Wright testified that the Fund later objected that the remediation costs were too high (although the Fund made only "a general statement," and would not "pinpoint what component of the bid or the costs were too high"). Wright testified that the Fund next

31

complained that the City had not provided all necessary information; she testified that, although the City "provided all the paperwork we had and tried to answer all their questions," the Fund was not satisfied and still refused to pay.

Wright also testified that, days before the trial was originally set to commence in 2008, the Fund sought a continuance on the basis that it was not responsible for any of the contamination north of the creek, because the source of that contamination was a store north of the site; this change of heart was nearly four years after the April 15, 2004 meeting with the City. Wright testified that the Fund's contention that the contamination had another source was belied by the fact that Rose-Lan had not encountered any contamination when they were working between the store and the contaminated area; she testified, in addition, that the City had not seen "any reports, any borings, anything that showed any flow of contamination" from the other site. Notably, Fine had not suggested that the contamination north of the creek had a different source during his initial investigations; and the Fund presented no evidence at trial to substantiate its contention that the contamination had migrated from another location.

Finally, as discussed in § II, above, at trial the Fund argued that the majority of Midwest Remediation's bill was not contamination-related, and that the majority of its costs – over $100,000 – would have been incurred whether or not contamination had been detected. As discussed in § II, the Fund made this argument based on a brief, casual analysis which was performed, from memory, by a former Midwest Remediation employee six years after Midwest Remediation's work was done. In addition, the Fund's claim that only *part* of Midwest Remediation's costs were reimbursable was inconsistent with the City's evidence as to Vuchetich's representations at the April 2004 meeting (that the Fund would pay *the entirety* of Midwest Remediation's net fees). In addition, the City presented evidence that this claim – that

32

only *part* of Midwest Remediation's costs were contamination-related – was an after-the-fact attempt to justify the Fund's refusal to pay. Thomas testified that the Fund raised no issues concerning the portion of Midwest Remediation's bill that was contamination-related in 2004, but instead first asked him to analyze Midwest Remediation's bill in 2010, six years later, at a time when supporting documentation was unavailable.

The City also presented evidence that the Fund's shifting, after-the-fact objections were merely a specific instance of a pattern of behavior in which the Fund would alter its coverage positions over time, and unreasonably delay the resolution of claims, to decrease the amount it would ultimately have to pay. Laura Luther, Remediation Unit Chief for the Missouri Department of Natural Resources, testified that on more than one occasion, the Fund had either denied a claim or refused to pay the full amount of a claim on the ground that the scope of remedial work being conducted was unreasonable, despite the fact that the Department had approved the remediation plan to which the Fund was objecting. Devin Pollock, an environmental scientist who had worked extensively with the Fund on remediation projects, testified that, in his experience, "[a]t the beginning [a cleanup project] would start off okay, but toward the middle or end when they had to pay invoices it was always delayed. It was – I would review invoices, submit those invoices to thee [sic] company, [the Fund], and then they would sit on them."

It is also significant that the Fund's Executive Director, Carol Eighmey, testified that Vuchetich's work with Midwest Remediation, to fashion a bid that would be "a sure bet" to be selected by the City, was inappropriate. Yet despite Eighmey's belief that Vuchetich had acted inappropriately, there was no evidence that Vuchetich had been reprimanded or disciplined, and he remained in the same position at the time of trial in 2011 as he had held in 2004.

33

Viewing the evidence in the light most favorable to the trial court's submission of the punitive damages claim, as required by our standard of review, we conclude that the City made a submissible case for punitive damages.

## X.

In its seventh Point, the Fund argues that the trial court erred by entering judgment against it for punitive damages of $2,500,000, because under § 510.265.1(2), punitive damages are limited to the greater of $500,000 or five times the net amount of the damages awarded to the plaintiff. The trial court held that § 510.265.1 could not be applied in this case, because the City's cause of action arose before the statute's 2005 effective date. The trial court erred in refusing to apply § 510.265.1.

"The interpretation of a statute and whether it applies to a given set of facts are questions of law, which we review *de novo*." *Hecht v. Hecht*, 289 S.W.3d 647, 649 (Mo. App. E.D. 2009). The legislature specified that § 510.265.1's cap on punitive damages would apply to "all causes of action filed after August 28, 2005." § 538.305.[9] The City filed its lawsuit in November 2005, after the punitive damages cap became effective. Therefore, § 538.305 requires that the punitive damages cap be applied.

The City argues that, despite § 538.305, the statutory cap on punitive damages cannot constitutionally be applied to this case, citing *Klotz v. St. Anthony's Medical Center*, 311 S.W.3d 752, 760 (Mo. banc 2010). *Klotz* was a medical malpractice suit in which a jury awarded economic and noneconomic damages to a patient and his wife. The trial court applied the newly enacted noneconomic damages cap found in § 538.210 (part of the same legislation as § 510.265), and eliminated the noneconomic damages awarded by the jury. Although the Klotzes

---

[9] Sections 510.265 and 538.305 were both enacted as part of H.B. 393. *See* 2005 Mo. Laws. 641, 647, 655.

34

cause of action accrued before the August 28, 2005 effective date, the trial court held that

§ 538.210 was applicable, because they did not file suit until after that date. The Missouri

Supreme Court disagreed. It held that:

> It is well established that the Missouri Constitution prohibits laws that are retrospective in operation. Mo. Const. art. I, sec. 13 ("That no ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation, ... can be enacted."). The prohibition reflects the underlying repugnance to the retrospective application of laws. This provision has been part of Missouri law since this State adopted its first Constitution in 1820.
>
> It is settled law in Missouri that the legislature cannot change the substantive law for a category of damages after a cause of action has accrued. In [*State ex rel. St. Louis-San Franscisco Ry. Co. v.*] *Buder*[, 515 S.W.2d 409 (Mo. banc 1974)]*,* when the legislature passed a law that increased the defendants' exposure to more damages for wrongful death than existed at the time the cause of action accrued, this Court unanimously held the legislation was unconstitutional as applied under the constitutional prohibition of retrospective laws. 515 S.W.2d at 411. Similarly, when, as here, the legislature, contrary to this clearly established constitutional precedent, passes a statute that purports to decrease the amount of damages a victim of medical malpractice could recover after the cause of action has accrued, this Court is bound by *Buder* to find the statute unconstitutional as applied to the Klotzes. Therefore, the new noneconomic damages cap established by HB 393 may not be applied to a cause of action that accrued prior to August 28, 2005.

*Klotz*, 311 S.W.3d at 759-60 (other citations and internal quotation marks omitted); *see also*

*Gervich v. Condaire, Inc.*, 370 S.W.3d 617, 623 (Mo. banc 2012).

The City argues that, as in *Klotz*, its cause of action accrued before August 28, 2005; the

City contends that under *Klotz*, the punitive-damage-limiting provisions of § 510.265.1 cannot be

applied to it. *Klotz* is readily distinguishable, however. *Klotz* dealt with § 538.210, which

limited a plaintiff's recoverable *compensatory* damages. *Klotz* emphasized that Missouri's

prohibition against the retrospective application of laws only prohibits a change in the

"substantive law"; *Klotz* holds that changes to the measure of compensatory damages is

"substantive."

35

The Missouri Supreme Court has not characterized a plaintiff's right to punitive damages as "substantive," however, and *Klotz* is therefore inapplicable to statutes which limit the recovery of punitive damages. In *Vaughan v. Taft Broadcasting Co.*, 708 S.W.2d 656 (Mo. banc 1986), the Supreme Court held that a statute enacted after a plaintiff's cause of action accrued, which *wholly eliminated* plaintiff's right to punitive damages, could be applied to plaintiff's pre-enactment claim. The Court explained that,

> [u]nder article I, section 13 of the Missouri Constitution, no statute retrospective in its operation can be enacted. This provision does not apply, however, to a statute dealing only with procedure or remedies. No person may claim a vested right in any particular mode of procedure for the enforcement or defense of his rights, and where a new statute deals only with procedure it applies to all actions including those pending or filed in the future. Nor does the federal constitution prevent a remedial or procedural provision from being applied retroactively because although a vested cause of action is property, the plaintiff has no property, in the constitutional sense, in any particular form of remedy; all that he is guaranteed by the Fourteenth Amendment is the preservation of his substantial right to redress by some effective procedure.
>
> . . . ***This Court finds that under Missouri law, punitive damages are remedial and a plaintiff has no vested right to such damages prior to the entry of judgment.*** Punitive damages are never allowable as a matter of right and their award lies wholly within the discretion of the trier of fact. The purpose of punitive damages is to inflict punishment and to serve as an example and deterrent to similar conduct. . . . [¶] . . . Such damages being allowed in the interest of society, and not to recompense solely the victim, to deny them cannot be said to deny any constitutional right or to encroach upon any judicial function, or to violate any constitutional guaranty of separation of powers.
>
> This Court concludes that the trial court erred in submitting a punitive damages instruction to the jury; ***plaintiff cannot recover punitive damages because he had no vested right to such damages at the time the 1982 statute became effective***.

*Id.* at 660-61 (emphasis added; citations and internal quotation marks omitted); *see also Goad v. Treasurer of State*, 372 S.W.3d 1, 8 n. 6 (Mo. App. W.D. 2011) ("statutory amendments reducing or eliminating *penalties* may be retrospectively applied"); *Ball–Sawyers v. Blue Springs Sch. Dist.*, 286 S.W.3d 247, 256-57 (Mo. App. W.D. 2009) (applying statute limiting the penalty

36

for an employer's failure to fully pay temporary worker's compensation award, to an underpayment which pre-dated the amendatory statute). Although the City argues that *Vaughan*'s holding was limited to *statutory* causes of action, *Vaughan* relied on numerous cases involving *common-law* causes of action to support its characterization of punitive damages as procedural and remedial. *Vaughan* is fully applicable to the City's non-statutory fraud and negligent misrepresentation claims.[10]

Because punitive damages are remedial in nature, the City had no vested right to punitive damages at the time the 2005 statute went into effect. Therefore, Article I, § 13 of the Missouri Constitution did not prevent § 510.265.1 from being applied in this case, and the legislature's directive to apply the statute to "all causes of action filed after August 28, 2005," § 538.305,

---

[10] In *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758 (Mo. banc 2007), the Missouri Supreme Court held that a new statute *authorizing* the award of punitive damages could not be applied retrospectively, because it "impose[d] a new disability" on a defendant, in violation of the rule that "laws providing for penalties and forfeitures are always given only prospective application." *Id.* at 771-72 (citation and internal quotation marks omitted). *Hess* is not controlling here, however, because it presents the opposite situation to this case. In *Hess*, a new statute *authorized the imposition* of punitive damages for the first time, and thereby imposed a new disability on the defendant. Here, by contrast, the new statute *limits the imposition* of punitive damages; as *Vaughan* explains, this limitation takes away no vested right of *a plaintiff*. *Hess* is distinguishable.

*Vaughan*'s holding that punitive damages are remedial and procedural, and that new statutory limitations on punitive damages may therefore be applied retrospectively, is arguably in tension with *Klotz*'s statement that "[i]t is settled law in Missouri that the legislature cannot change the substantive law for a category of damages after a cause of action has accrued." 311 S.W.3d at 759-60; *see also*, *Gervich*, 370 S.W.3d at 623. *Vaughan*'s emphasis on the "procedural" or "remedial" nature of punitive damages is also arguably in tension with the statement in *State ex rel. St. Louis-San Francisco Railway Co. v. Buder*, 515 S.W.2d 409 (Mo. banc 1974), that "[m]erely to label certain consequences as susbstantive and others as procedural" is not decisive of the retrospectivity question. *Id.* at 411. Instead, *Buder* suggests that retrospectivity analysis should be guided by the principle "that an act or transaction, to which certain legal effects were ascribed at the time they transpired, should not, without cogent reasons, thereafter be subject to a different set of effects which alter the rights and liabilities of the parties thereto." *Id.* The fact remains, however, that *Vaughan* addresses the precise question presented in this appeal: whether a statute limiting the recovery of punitive damages may be retrospectively applied to a cause of action accruing before the statute's enactment. We consider ourselves bound to follow the specific holding of *Vaughan*, despite more general statements in other cases which arguably point in a different direction.

37

must be applied. The trial court erred in failing to limit the punitive damages awarded in this case to five times the net amount of the judgment entered against the Fund.[11]

The City argues that, even if it is otherwise applicable, § 510.265.1 violates its right to trial by jury and is therefore unconstitutional. *See Watts v. Lester E. Cox Med. Ctr.*, 376 S.W.3d 633 (Mo. banc 2012).

Because the City's argument deals with the constitutional validity of a statute, our first task is determining whether this Court has jurisdiction in this case. The Supreme Court of Missouri has exclusive appellate jurisdiction over issues involving the validity of a statute. Mo. Const. art. V, § 3; *Glass v. First Nat'l Bank of St. Louis, N.A.*, 186 S.W.3d 766 (Mo. banc 2005). Where, however, a party has not properly preserved its constitutional claim for appellate review, jurisdiction is vested in this Court, not the Supreme Court. *See*, *e.g.*, *Youngs v. Pitts*, 335 S.W.3d 47, 54 (Mo. App. W.D. 2011); *S.A.S. v. B.P.*, 314 S.W.3d 348, 353 n.2 (Mo. App. E.D. 2010).

> To properly raise a constitutional issue, a party must: (1) raise the question at the first available opportunity; (2) specifically designate the constitutional provision alleged to have been violated, such as by explicit reference to the article and section, or by quotation from the particular provision; (3) state the facts showing the violation; and (4) preserve the constitutional question throughout for appellate review. Additionally, a constitutional challenge to a statute must not

---

[11] Section 510.265.1 provides that its limitations on punitive damages "shall not apply if the state of Missouri is the plaintiff requesting the award of punitive damages." The City argues that it should be considered "the state of Missouri" for purposes of § 510.265, and that the punitive damages cap is therefore inapplicable to it. The sole authority cited by the City to support this argument is § 70.120(3), which defines a "political subdivision," for purposes of §§ 70.120 to 70.200, as "any agency or unit of this state which now is, or hereafter shall be, authorized to levy taxes or empowered to cause taxes to be levied." Section 70.120(3) does not define "the state of Missouri," but only defines the term "political subdivision." *Cf. P.L.S. ex rel. Shelton v. Koster*, 360 S.W.3d 805, 813 (Mo. App. W.D. 2011) (distinguishing school district, which is a "political subdivision," from the "agenc[ies] of the state" covered by the State Legal Expense Fund, § 105.711.2(1)). Moreover, by its terms § 70.120(3) has no applicability to § 510.265.1, and the City cites no caselaw which holds that a municipality should be considered "the state of Missouri" for the purposes of § 510.265, or in interpreting statutes generally. We reject the City's argument without further discussion. We note, however, that it would be curious if we were to find that *the plaintiff City* is the "state of Missouri" for purposes of § 510.265.1, when it is *the defendant Fund* which is a special trust fund within the Missouri treasury, and is being represented by the Attorney General in this litigation.

38

> only have been presented to the trial court, but the trial court must have ruled thereon.   The purpose for this requirement is to give the trial court an opportunity to fairly identify and rule on the issues and to prevent surprise to the opposing party.

*S.A. v. Miller*, 248 S.W.3d 96, 101 (Mo. App. W.D. 2008) (citations and internal quotation marks omitted).  Where a party "first challenges the constitutionality of [a statute] on appeal, the issue has not been preserved for appellate review."  *Young*, 335 S.W.3d at 55.

The Fund argued for a reduction of the punitive damages award under § 510.265.1 in a post-trial motion.  In response, the City argued that the statute could not be applied to its pre-enactment claim, and that it was exempt from the statute because the City was "the state of Missouri" and thus explicitly exempted from § 510.265.1's operation.  At no time in the trial court did the City argue that § 510.265.1 was unconstitutional because it violated the City's right to a trial by jury.

By failing to challenge the constitutionality of § 510.265.1 in the trial court, the City failed to preserve the constitutional challenge for appellate review.  The City argues that this preservation principle should not apply to it because it is the respondent on appeal, and because it prevailed against the application of § 510.265.1 in the trial court on other grounds.  To the contrary, however, we found constitutional challenges to a state statute to be waived in a similar procedural context in *McCormack v. Capital Electric Construction Company*, 159 S.W.3d 387 (Mo. App. W.D. 2004).  In *McCormack*, the trial court entered a judgment in a personal-injury action which included the award of prejudgment interest. *Id.* at 394.  Although the plaintiff had sought prejudgment interest under the challenged statute in a pretrial settlement offer letter, and in an amended petition, the defendant did not argue that the prejudgment interest statute was unconstitutional until after the trial court had entered judgment awarding prejudgment interest. *Id.* at 404.  The trial court *granted* the defendant's motion to amend the judgment, and eliminated

39

the prejudgment interest, but (as here) on grounds other than the constitutional validity of the prejudgment interest statute.

Thus, the defendant in *McCormack* was in the identical position to the City in this appeal: it had *prevailed* in the trial court against application of a statute on non-constitutional grounds; and it was the respondent on appeal. If anything, the defendant in *McCormack* was in a *better* position than the City, because it actually raised its constitutional claim in the trial court (albeit belatedly); here, by contrast, the City never raised its constitutional argument *in any fashion* in the trial court.

Although the defendant was the prevailing party on the statute's applicability in the trial court, and was the respondent on appeal, we nevertheless refused to consider its constitutional challenge on appeal. We held that the defendant failed to preserve the constitutional issue in the trial court, because "it failed to raise any constitutional challenge to the statute at an earlier stage that would have allowed the trial court a full opportunity to identify and rule on the issue prior to the entry of judgment." *Id.* at 404. Under *McCormack*, the City's failure to raise its current constitutional argument *in any manner* in the trial court prevents it from raising that issue now.

Section 510.265.1(2) limits the City's recovery of punitive damages to five times the net amount of the judgment awarded against the Fund. The City does not dispute that the relevant amount of the judgment is $172,100.98. Given the underlying judgment amount, the punitive damages award must be remitted to $ 860,504.90. Under Rule 84.14, we have the authority to modify the circuit court's judgment to reflect this reduced punitive damage award, without the necessity of a remand. Because we conclude that the punitive damages award was limited by § 510.265.1, we need not address the parties' arguments concerning the application of due process principles to the punitive damages awarded in this case.

40

## Conclusion

The circuit court's judgment is affirmed, except that we modify the judgment pursuant to Rule 84.14 to reduce the punitive damages awarded against the Missouri Petroleum Storage Tank Insurance Fund to $ 860,504.90.

_____
Alok Ahuja, Judge

All concur.